## TEXAS EMPLOYERS' INS. ASS'N v. KELLY.

No. 12944.

Court of Civil Appeals of Texas. Fort Worth.

March 3, 1934.

Rehearing Denied April 20, 1934.

Todd & Crowley, of Fort Worth, for appellant.

Houtchens & Houtchens and J. Harold Craik, all of Fort Worth, for appellee.

POWER, Justice.

Plaintiff was employed by Mrs. Baird's Bakery, a corporation, and at the time of her alleged injury the bakery carried its compensation insurance with appellant Texas Employers' Insurance Association. It was alleged and proven that appellee was carrying a number of pasteboard cartons to be used for cake boxes across a freshly oiled floor when she slipped and fell in a sitting position, by reason of which she was injured in the pelvic region, and it was shown that the jolt dislocated her uterus, resulting in excessive menstruation.

The case was submitted to a jury upon special issues, and the jury found that appellee sustained an injury while engaged in the duties for which she was employed; that the injury was proximately caused by plaintiff falling on the floor in the place of employment; that by reason of such injury she was totally incapacitated from performing the usual tasks of a workman, and that such total incapacity is permanent; that she was and is totally incapacitated for a period of 401 weeks; that her injury was not caused by reason of a diseased condition and was not the direct and proximate result of some functional abnormality; and that she was not suffering as a result of a constitutional abnormality.

Appellant requested the court to submit to the jury three issues: First, as to whether or not appellee sustained partial disability; second, as to the percentage of such partial disability; and, third, as to the continuance of such partial disability. These special issues were refused, and this appeal is based on such refusal.

Appellee's pleading is sufficiently broad to plead both total and partial incapacity. In so far as the pleading is involved, the issues as to both total and partial incapacity were joined by a general denial by appellant. This brings us to the question as to whether or not there was evidence sufficient to form a jury question as to partial incapacity. If there is evidence sufficient to sustain the issue as pleaded as to partial incapacity, then the court erred in not presenting the requested special issues as to partial incapacity to the jury.

The evidence most favorable to appellant as to partial incapacity is as follows:

Dr. Abraham Antweil testified in part that: "Women very frequently have irregular menstrual periods," and this is true "when they have not had any injury." "If you have an injury to any tissue, if a person is going to bleed, there must come a time when they will stop bleeding, just like when you have a cut on your finger, if you have an injury to your finger the bleeding is going to stop eventually and any traumatic bleeding will eventually stop if you have an injury to the womb."

He further testified with reference to the possibility of her fall causing the injury that she complains of as follows: "You might get a little bleeding immediately after the injury and then nature takes care of that in time and it clears up and it doesn't bleed continuously for this length of time. * * * A woman can fall and jar her uterus and it may drop back a little, but there are enough ligaments to gradually take it back into its normal position."

He further testified as follows:

"Q. Doctor, going back to the date of the first examination, and if you do not recall it, you may refer to the notes you have—by the way, those memorandums you have were made immediately after the examinations, were they? A. Yes, sir.

"Q. All right, what did you find her condition to be at that time, Doctor, and what examination did you give her? A. I gave her a complete examination at the time, and the only thing I could find was she was a girl a little underweight; her temperature and pulse was normal, and her female organs were normal.

"Q. Doctor, did you find that her womb— by the way, is the womb and uterus all the same organ? A. Yes.

"Q. Did you find that the uterus had been displaced? A. No, sir.

"Q. Was it inflamed? A. No, sir.

"Q. Was it red? A. No, sir.

"Q. Was it enlarged? A. No, sir.

"Q. Was it displaced backward? A. No, sir.

"Q. Was there any abnormality about the uterus? A. I couldn't find any abnormality.

"Q. Did you look at it? A. Yes, sir.

"Q. Tell the jury what examination you

made, and how you conducted your examination. A. Well, the way we do an examination on a woman is, we first look at it, and then we do what we call the bimanual examination, put your finger inside of the genitals, and feel around, and see whether the womb is enlarged, and the tubes and ovaries. And all of that was negative, there was no enlargement, no inflammation, no bruises, or cuts, or anything like that. And then we have an instrument that we can look at the mouth of the womb and see whether there are any growths, or any inflammation, and that was negative, and everything looked normal. * * *

"Q. What was your conclusion about whether or not any traumatic injury damaged her womb or uterus, or any of her female organs at the time you made the examination? A. My conclusion was that she had no evidence of any injury, and no trauma. * * *

"Q. I believe you said that she didn't complain of such. Now then, about October 13th, I believe you made another examination, or started it, started another examination, you and Dr. Johnson? A. Yes, sir.

"Q. Prior to the time that you went into that examination, Dr. Antweil, was she requested to tell you doctors what her symptoms were and what her complaints were? A. We always ask, before an examination, what their complaints are, yes, sir.

"Q. What did she complain of at that time, Doctor? A. The same thing.

"Q. Did she complain of her hips being hurt? A. No, sir. She complained of back ache, pain in her abdomen, and irregular bleeding from her womb.

"Q. How far did you and Dr. Johnson get in the examination? A. Well, we never got to complete the examination. She refused to let Dr. Johnson and myself put a speculum in her vagina to examine the mouth of the uterus.

"Q. What part of the examination did you complete, Doctor? A. We completed the physical examination of the chest, the abdomen, externally; the extremities, the head, nose, throat, and everything but the examination of the genitals.

"Q. At that time did you find any abnormalities of any of those external organs, or in any part of her body, other than the fact that she was undernourished? A. We didn't find anything except, as you say, undernourished."

Upon cross-examination, he testified:

"Q. Doctor, do you tell this jury that there is nothing wrong with that lady today, is that your testimony to the jury? A. The only thing I find with this girl is that she is underweight.

"Q. And your opinion is that there is nothing wrong with her, from the standpoint of any physical ailments at all, is that your testimony to this jury? A. Yes, sir."

Dr. Jack Daly testified as follows:

"Q. Did you and Dr. Antweil make an examination? A. We did.

"Q. Tell the jury, doctor, how you conducted your examination and what you did in order to find out what was wrong with her. A. After ascertaining from Miss Kelly the nature of how she received her injury, and the history of her case up to the time of her injury, and up to the present time, Dr. Antweil's office assistant prepared her for an examination, and this examination consisted of a general physical examination, and what is known as a vaginal examination, an examination of the pelvic organs; a rectal examination was made as well, and a urological examination.

"Q. Dr. Daly, from your examination, tell the jury whether or not you found her uterus and ovaries and other female organs to be in normal position? A. The pelvic and vaginal examination of Miss Kelly did not reveal any evidence of disease.

"Q. Doctor, were any of her organs enlarged or inflamed? A. It was my opinion that there was absolutely no evidence of any inflammation of any sort, and there was not any enlargement of any of the female organs. * * *

"Q. Dr. Daly, from her narration of how this accident happened, tell the jury whether or not it would be likely or could even be possible for any misplacement, or injury to occur to her uterus. A. It would not; from the nature of this accident, as Miss Kelly described it to me, it would be my opinion that it would be a physical impossibility for her to suffer any laceration of the uterus or any misplacement of the uterus from such an accident. * * *

"Q. Doctor, I will ask you whether from your examination you found from the physical, pelvic, vaginal and urological examination, any abnormalities present in this young lady? A. I did not; no, sir."

Dr. W. B. McKnight testified as follows:

"Q. Doctor, what examination did you make of her please, sir? A. Well, sir, I made

a digital examination of the uterus, and used a speculum to verify the condition of that.

"Q. Tell the jury what conclusion you came to after making your examination, Doctor. A. I found the organs normal and in position and practically in size, possibly a little under size, but very little for that size person; it was normal in position, and was not fixed, was perfectly moveable and loose, and floated about.

"Q. Dr. McKnight, did you find any abnormality there in the position of it, in the shape of it, or size of it, or any abnormality whatsoever? A. No, sir.

"Q. What is your opinion, Dr. McKnight, with reference to whether a fall of that kind would produce uterine bleeding that covers a long period of time? A. Those conditions in unmarried girls up to twenty-five are generally due to some general cause, and not an accident of that sort.

"Q. Did you see anything about her condition that would suggest to you that her condition was the result of an accident or an injury? A. No, sir."

This evidence shows, in effect, that, if there was traumatic injury to the womb causing bleeding, it would eventually stop, and, if bleeding is caused by traumatic injury to the womb in an injury caused as this was alleged to have been caused, the bleeding would not continue for the length of time alleged and proven by appellee; that a woman can fall and jar her uterus and it may drop back a little, but there are enough ligaments to gradually take it back to its normal position; and that, as to physical ailments at the time of the trial—92 weeks after the injury—there was nothing wrong with appellee. This and other evidence quoted is competent evidence showing more directly a limitation as to the time appellee might or did suffer from her injury.

■ It is stated in Law of Special Issues, by Judge Speer, page 215: "A fact directly proven to exist may, by the process of proper inferences or factual deductions, likewise prove the existence of another fact between which facts a causal relation exists. To say then that the act of drawing legitimate inferences and conclusions as to the existence of facts from other facts in evidence, is for the jury, is but stating in different words the ordinary function and right of the jury to weigh the evidence. It is therefore not required or permitted of the court, to indulge these inferences or conclusions of fact any more than it is to find the parent facts in the first place. But where an ultimate issue is raised by such permitted inferences and conclusions, it is peculiarly a jury question. This is no more than the application of the ordinary rule attaching evidentiary weight to circumstantial evidence. In final word, a fact which may or may not be found by way of inference or conclusion from the evidence is itself a submittable fact."

■■ It appears to this court that, from the facts proved, a jury would have been warranted by proper reasoning, inferences, and deductions in finding partial incapacity if that issue had been submitted to them. In the consideration of the evidence there is a field for thought and conclusion by the jury that appellee was injured but only partially incapacitated for a part or all the time. It is no answer to say that, since the jury found total incapacity, it would be presumed it would have found against appellee on the issue of partial incapacity. A jury should not be deprived of its right to pass upon all issues formed by pleading and evidence. Had the issue of partial incapacity been submitted, it might have found thereon in favor of appellee. In other words, they might have given effect to the issue had it been brought to their attention. This is the holding of the courts in Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517; Indemnity Ins. Co. v. Boland (Tex. Civ. App.) 31 S.W.(2d) 518.

■ Several assignments of error complain of the argument of counsel for appellee. This argument in some instances was perhaps objectionable as being out of the record. An explanation by the court shows that much of the argument was provoked or invited by the argument of counsel for appellant. Much of the argument by both counsel for appellant and appellee was uncalled for and out of place, but, since it will probably not occur again, it will serve no good purpose to discuss the matter here, other than to say that argument of counsel should be kept within the record.

The case is reversed and remanded.